IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SANTOSH RAM                                                                                    PLAINTIFF

v.                        Civil No. 5:20-cv-05151-TLB-MEF

SCOTT LAY                                                                                      DEFENDANT

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Santosh Ram ("Ram"), brought this action against Defendant, Scott Lay ("Lay'), alleging conversion and the intentional infliction of emotional distress. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Presently before the Court is the Motion for Summary (ECF Nos. 72-74) filed by Lay. Ram has responded (ECF No. 92). Lay filed a reply brief (ECF No. 97). The Motion is ready for decision. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred the Motion for Summary Judgment to the undersigned for the purpose of making a Report and Recommendation.

### I.   BACKGROUND

On March 18, 2013, Ram was arrested on federal criminal charges.[1] (ECF No. 14 at 7). Jack Schisler, an Assistant Federal Public Defender ("AFPD") for the Western District of Arkansas, was appointed to represent him. *Id.* Ram indicates he was suffering from severe depression "and mental disorder/disease." *Id.* Ram, who is from India, indicates he did not know anything about the laws in the United States. *Id.* Ram asked Lay, who was a priest, his friend,

---

[1] Ram entered a guilty plea and was sentenced on February 18, 2014, to a period of incarceration. (ECF No. 14 at 8); *United States v. Ram*, 5:13-cr-50045-001 (ECF No 47).

1

and co-worker, to assist him. *Id.* AFPD Schisler and Lay came to the Washington County Detention Center, where Ram was housed, and asked him to sign a power of attorney that would allow Lay to pay the court ordered fees. *Id.* On April 4, 2013, Ram signed a comprehensive power of attorney giving Lay authority over, among other things, his personal property and banking accounts. (ECF No. 72-1).[2] When Kimberly Weber was retained to represent Ram, Lay paid her attorney fees.[3] (ECF No. 14 at 7; ECF No. 72-2 at 3).

At the time of his arrest, Ram alleges he had the following assets: (1) a savings account, a checking account, a debit card, and a credit card with the Bank of America ("BOA")[4] containing $22,000 in funds[5]; (2) property in his apartment in Rogers, Arkansas, which included his educational certificates/diplomas, "experience certificate," an external hard drive, and other items; (3) a 2010 Toyota Corolla; and (4), his wallet. (ECF No. 14 at 7-8; ECF No. 72-2 at 5).

Ram maintains Lay put approximately $400 to $600 on his commissary account in 2013-2014; paid court and attorney's fees in the approximate amount of $9,400[6]; and misused the

---

[2] All references to materials contained in the summary judgment record are to the ECF number and page rather than to the exhibit designations given to them by the parties.

[3] A portion of the fees had been paid into the registry of the Court when Mr. Schisler represented Ram and Lay assisted in getting these funds paid to Ms. Weber.

[4] The only documents received by defense counsel in response to his subpoena to the BOA dealt with the credit card. No checking or savings account records were produced. (ECF No. 72-2 at 4). The documents indicate Ram's credit card had a maximum limit of $2,500. *Id.* The documents contain no transaction details except for a couple of charges from AT&T in the amount of $65.73. *Id.* While Ram conceded his phone service was provided by AT&T, he testified he could not be sure the charges were for his phone. *Id.* at 6. He could not recall having his phone bill charged to his credit card. *Id.*

[5] Ram currently has no records showing the amount of funds he deposited in these accounts. The Court attempted to subpoena the records at Ram's request, at the address he provided, but no records were produced. (ECF No. 75). The Court issued a Show Cause Order (ECF No. 89) and no response was filed. Reference to Ram's criminal case indicates that on March 12, 2013, he represented to the Court in a financial affidavit made under penalty of perjury that he had $3,000 in his checking account and $7,000 in his savings account. *United States v. Ram*, 5:13-cr-50045-001 (ECF No. 6). Lay previously asked the Court to un-seal this financial affidavit. (ECF No. 51). As noted in an Order entered on March 9, 2022, the affidavits are not to be included in the public case file. *Guide to Judicial Policy,* Vol. 10, § 340, Judicial Conference on Privacy and Public Access to the Electronic Case Files (March 2008). The Court has reconsidered, as the affidavit provides the only evidence of the balances in Ram's checking and savings account at the relevant time; however, only these figures will be provided in connection with this case. The financial affidavit remains sealed.

[6] Ram concedes his attorney's fees were paid with the exception of "600-something" which he owed Ms. Weber. (ECF No. 72-2 at 4).

2

remaining money and credit card for his own personal purposes without Ram's consent. (ECF No. 14 at 8). In his interrogatory responses, Lay stated he made a single payment from Ram's bank account to Ms. Weber. (ECF No. 93 at 19). Lay indicates he then closed, at Ram's direction, the bank account to avoid recurring charges. *Id.* at 20, 27. Lay denies having used any of Ram's money for personal uses. *Id.* at 20. Lay indicates he never submitted an expense report "because none was requested, nor was one legally required. All [he] did was pay money to [Ram's] attorney at his direction." *Id.*

Ram says that when he called the BOA about his accounts, he was told it was closed and no transaction detail could be provided as it was archived. (ECF No. 14 at 8). Ram was told he would have to personally appear at the branch office to obtain the details--something Ram was unable accomplish due to his incarceration. *Id.*

The credit card records submitted by Lay do not begin until the statement for the period ending on February 26, 2014, at which time the balance on the card was $3,204.85. (ECF No. 72-5 at 1). The final record is the statement for December 29, 2021-January 28, 2022, and it shows a current balance of $3,336.31, which is more than its $2,500 credit limit. (ECF No. 72-5 at 83). As Ram correctly notes, there are no records for 2013, and not all monthly statements for 2014 are provided. *See e.g., id.* at 3, 4 (skips from statement for the period ending April 25, 2014, to statement for the period ending February 28, 2015). Further, there are no records indicating what the charges were or when they were made which resulted in the balance exceeding the credit limit. Lay maintains he did not have access to Ram's credit or debit cards. (ECF No. 93 at 19).

With respect to the personal property in Ram's apartment, Lay states that the majority of items, including all electronics, were seized by Homeland Security. (ECF No. 93 at 19). According to Lay, Ram's furniture was donated per his request. *Id.* Lay indicates he "retrieved

and retained for safekeeping a suitcase having some documents and [Ram's] tennis rackets." *Id.* Lay admits the documents included the diplomas. *Id.* at 24. Lay denies he received any of Ram's property from the WCDC. *Id.* at 19.

Beginning in late 2018, Ram attempted to contact Lay through letters, phone calls, and voice mails for the return of his money and property. (ECF No. 72-2 at 8, 12; ECF No. 92-1 at 3). Ram received no responses. *Id.* In December 2018, Ram sent a certified letter to Lay at his Springdale address. (ECF No. 72-2 at 8). The letter was returned as undelivered. *Id.* Ram says Lay never notified him that he had moved. (ECF No. 92-1 at 2). In his interrogatory responses, Lay denies having received calls, voice messages, and letters from Ram requesting his property prior to the filing of this case. (ECF No. 93 at 20).

Ram's personal papers included his bachelor's and master's degree diplomas from two separate universities in India. (ECF No. 72-2 at 9-10). Because he is not a citizen, Ram testified he needs his papers for his visa, work permit, passport, and to obtain a job.[7] *Id.* Ram testified he left Lay a voicemail asking for his certificates and offering to pay the cost of mailing the documents. *Id.* at 14. In responses to interrogatories, Lay admitted he had a suitcase with papers in it. (ECF No. 93 at 19). Lay also stated the only request for Ram's property was made by Ms. Weber's office. *Id.* at 21. Lay agreed to surrender the possessions to Ms. Weber but advised her office that they would need to send a representative to his house to retrieve the property. *Id.* No one from Ms. Weber's office ever retrieved the possessions. *Id.*

At the time of Ram's deposition in May 2022, defense counsel represented that the papers would be sent to Ram. (ECF No. 72-2 at 17). When he responded to the summary judgment in

---

[7] Throughout the deposition, Lay's counsel derided Ram's testimony. By way of example, when Ram testified he needed his degree diplomas to obtain jobs, counsel remarked he found Ram's testimony to be unbelievable, unique, and rich. (ECF No. 72-2 at 9). Counsel's personal opinion as to the veracity of the testimony should not be voiced during the taking of a deposition. The Court expects counsel to act with civility and professionalism.

July 2022, Ram said he had not received the papers. *Id.* Lay did not address this issue in his reply brief. (ECF No. 97).

With respect to the Toyota, Ram had financed the vehicle purchase with Advancial on July 31, 2012. (ECF No. 72-2 at 7). He financed $14,000 on the vehicle, and he also took out a signature loan in the amount of $8,000. *Id.* The Toyota was repossessed on August 31, 2013. *Id.* at 8. The car was sold and Advancial credited the loan with the sale proceeds, leaving a deficiency in the amount of $1,821.75. *Id.*; ECF No. 72-6 at 5.

Ram testified his back-up external hard drive contained his personal documents, family pictures, family videos, and other materials. (ECF No. 72-2 at 10-11). As the laptop was the only item forfeited, Ram believed the external hard drive might have been returned to Lay. *Id.* at 11.

Ram had his wallet with him at the time he was arrested. (ECF No. 72-2 at 12). Ram believed Lay had his wallet because the power of attorney allowed Lay to take possession of Ram's property. *Id.* at 11. Ram testified that Lay was the only option he had at the time. *Id.* As for the property he had at the Washington County Detention Center ("WCDC"), in his declaration Ram indicates that when he received documents in response to a subpoena issued by the Court, he discovered his property had been destroyed after calls to Lay went unanswered. (ECF No. 92-1 at 4). Ram also believed Lay received the property that was not forfeited at the end of his criminal case. (ECF No. 72-2 at 12). As discussed below, this proved to be untrue.

Ram testified Lay engaged in extreme and outrageous conduct when he took Ram's property, misused funds, refused to return the property, never responded to calls, letters, or voicemails, and did not inform Ram he had moved to Missouri. (ECF No. 72-2 at 12, 15, 16). Further, Ram says when he had a co-worker, Steve Zhou, reach out to Lay to obtain his new

5

address in 2021, Lay did not respond until a week before the deposition was taken on May 5, 2022. *Id.* at 16; *see also* ECF No. 93 at 38 (Ram's communication with co-worker); ECF No. 92-1 at 1.

Ram indicates he has a history of PTSD and had been receiving treatment before his arrest. (ECF No. 92-1 at 1). After his incarceration, Ram states he was suffering from severe anxiety and depression. *Id.* Ram asserts that he suffered "severe emotional distress due to [the] conduct of ... Lay." *Id.* at 3. Ram maintains his inability to obtain his educational certificates destroyed his future plans and caused him to spiral downward. *Id.*

Reference to Ram's criminal case, *United States v. Ram*, 5:13-cr-50045-001, reveals Ram's laptop was forfeited to the government at the time of sentencing. (ECF No. 45).[8] In August 2019, Ram filed a motion for return of his personal property including his passport and the external hard drive. (ECF Nos. 137, 139). The government was directed to return Ram's passport. (ECF No. 142). His request for return of the remaining seized property, including the external hard drive, was denied as the government was no longer in possession of the property. (ECF No. 144). By affidavit, the government indicated that in February 2019, Homeland Security Investigations closed the criminal case and authorized the destruction of the property seized. (ECF No. 143-1).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine

---

[8] All ECF references in this paragraph are to Ram's criminal case.

issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). A fact is "material" if it may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Lay maintains he is entitled to judgment in his favor for the following reasons: (1) there is no evidence that he converted any of Ram's assets; (2) there is no evidence to support the intentional infliction of emotional distress claim; and (3), there is no basis for an award of punitive damages.

### A. Conversion

In *Integrated Direct Marketing, LLC v. May*, 495 S.W.3d 73, 75 (Ark. 2016), the Arkansas Supreme Court discussed the tort of conversion and said:

> [C]onversion is a common-law tort action for the wrongful possession or disposition of another's property; to establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of, or is inconsistent with, the owner's rights. Conscious wrongdoing is not the requisite intent for

7

> conversion; what is required is the intent to exercise control or dominion over goods. Unlike some jurisdictions, Arkansas does not require that the owner or person entitled to possession be completely deprived of their property in order for a conversion to occur. Rather, conversion occurs if the defendant exercises dominion over property in violation of, or in a way that is in denial of or inconsistent with, the rights of the owner or person entitled to possession.

*Id.* 495 S.W.3d at 75 (cleaned up). "Proof of demand and refusal, or non-compliance, is *prima facie* evidence of conversion." *Ray v. Light*, 34 Ark. 421, 427 (Ark. 1879).

Ordinarily, "[t]he proper measure of damages for conversion of property is the market value of the property at the time and place of the conversion." *Hatchell v. Wren*, 211 S.W.3d 516, 521 (Ark. 2005). "Fair market value is defined as the price the personalty would bring between a willing seller and a willing buyer in the open market after negotiations." *Midfirst Bank v. Sumpter*, 508 S.W.3d 69, 79 (Ark. App. 2016). However, "the circumstances of the case may require a different standard, including a measure of expenses incurred as a result of the conversion." *Brown v. Blake*, 161 S.W.3d 298, 305 (Ark. App. 2004) (citation omitted).

The summary judgment record establishes that no conversion occurred as to several accounts and items. First, regarding the checking and savings account balances, Ram agrees that at least $9,400 was paid to his attorney, and he further testified that Lay put between $400 and $600 in his commissary account.[9] According to Ram's financial affidavit, these payments exhausted the funds in both those accounts. Consequently, this also means Lay did not convert any funds by means of the debit card. Second, the records establish that the Toyota Corolla was repossessed by Advancial and Ram was properly credited with the sale proceeds. Third, Ram testified he had his wallet on him when he was arrested and that his property at the WCDC was

---

[9] In his statement of undisputed facts, Lay states there is no proof Ram ever had a BOA checking or savings account. (ECF No. 73 at 2). However, it is clear accounts existed at some financial institution since Lay utilized the funds to pay Ms. Weber. Lay also admits he closed the accounts. (ECF No. 93 at 21).

destroyed. Fourth, records from Ram's criminal case establish that the external hard drive and other items seized from Ram's apartment were destroyed in early 2019 prior to Ram filing a motion for return of property.

This leaves only Ram's credit card and his personal documents and other items contained in the suitcase that was still in Lay's possession at the time this summary judgment motion was filed. Lay argues that Ram cannot establish Lay ever had possession of the credit card or charged any amounts to it. The initial burden is on Lay to establish that there is no genuine issue of material fact as to whether he converted funds by means of the use of the credit card. The BOA documents submitted by Lay only establish that he converted no funds in 2014 or subsequent years as the credit card balance exceeded its limit. The only charges contained in the BOA records were for a recurring charge from AT&T. Ram admits that his phone service was provided by AT&T. It is pure speculation that these charges relate in any way to Lay.

Lay contends the BOA records establish Ram's "credit card account never had an available credit limit which would allow new charges to be made upon it." (ECF No. 73 at 2). This statement misses the mark as the records do not cover the year 2013, which is clearly the relevant period as this was when Ram was arrested and executed the power of attorney. There is no evidence establishing what charges were made which resulted in the credit card exceeding its stated limit of $2,500. Lay maintains that it is a matter of public record that the BOA only maintains records for seven years. To support this statement Lay relies on the BOA website[10] and an answer to a frequently asked question: "Why should I go paperless." However, the statement quoted and relied on by Lay appears to be a response to a frequently asked question about deposit accounts and not credit cards. While the same may be true for credit card statements, the Court cannot reasonably

---

[10] https://www.bankofamerica.com/deposits/accountstatements-Faqs (accessed October 27, 2022).

infer from this that no credit card statements from 2013 exist. Further, the statement appears to be belied by the fact that in 2022 the BOA produced statements for the credit card dating back to 2014—eight years ago.

Conversion exists only if Lay exercised dominion and control over the credit card. With respect to his access to the credit cards, Lay has stated in response to an interrogatory that he did not have access to the credit card.[11] (ECF No. 93 at 19). In his deposition, Ram did not testify about any facts from which it could be inferred that Lay had possession of the credit card or in any way exercised dominion and control over available credit on the credit card account. Absent such proof, no conversion could occur. Lay is entitled to summary judgment on the claim related to the credit card.

Lay admits having possession of a suitcase containing various papers belonging to Ram, including his bachelor's and master's degrees. While Lay denies having received any phone calls, voice mails, letters or other communications from Ram requesting return of these items, Ram vehemently maintains he attempted to communicate with Lay using these methods beginning in 2018. While any letters would have been sent to the wrong address (as Lay no longer lived in Springdale), nothing in the record suggests Lay changed the number of his cell phone. As of the filing of Ram's Response to the Summary Judgment Motion, on July 12, 2022, Lay still retained possession of the suitcase containing the documents at issue.

Lay argues taking possession of these documents was "specifically within the grant of authority of the power of attorney and not 'in violation of plaintiff's rights.'" (ECF No. 74 at 8). While this is true, retention, after demand for return of the property, is not within the authority of the power of attorney and can constitute conversion. There is a genuine issue of material fact as

---

[11] The Court notes the discovery responses were submitted by Ram. The Court further notes that Lay did not submit his own affidavit in support of the summary judgment motion.

10

to whether or not Lay received notice of Ram's demand for return of the property. There is no question that Lay had notice as of the date of the filing of this lawsuit, August 20, 2020, and yet he has still retained possession of the documents.

Next, Lay asserts that "Ram has no legal basis to connect Lay to any loss in this regard, and Ram has no evidence or testimony to establish the value of any replacement certificate because he never made any request for one." (ECF No. 74 at 9). Lay maintains replacement degree certificates are of nominal cost. As noted in *Brown*, 161 S.W.3d at 305, the circumstances of the case may dictate application of a different measure of damages rather than the value of the property at the time of conversion including a "measure of expenses incurred as a result of the conversion."

Lay is entitled to summary judgment with respect to the checking and savings accounts, the debit card, the Toyota, the wallet, the external hard drive, and the credit card. There are genuine issues of material fact as to whether Lay converted the documents contained in the suitcase by failing to return the items after demand for return was made.

### B. Intentional Infliction of Emotional Distress

The Arkansas Supreme Court first recognized the tort of intentional infliction of emotional distress—also known as the tort of outrage—in *M.B.M. Co., Inc. v Counce*, 565 S.W.2d 681, 687 (Ark. 1980). "By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. *Id.* (citing Restatement (Second) of Torts § 46 cmt. d). The Arkansas Supreme Court, referencing Professor Prosser, noted that "there are cases in which the extreme and outrageous nature of the conduct arises not so much from what is done as from the abuse by the defendant of a relationship with the plaintiff which gives power to damage the plaintiff's interests." *Id.* at 688 (citing Prosser, Insult & Outrage, 44

Cal. L. Rev. 40, 49). "[R]ecognition of this tort is not intended to open the doors of the courts to every slight insult or indignity one must endure in life." *Hess v. Treece*, 693 S.W.2d 792, 796 (Ark. 1985) (cleaned up).

To establish the tort of outrage, Ram must prove: (1) Lay intended to inflict emotional distress, or he knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous and was utterly intolerable in a civilized community; (3) Lay's conduct was the cause of Ram's distress; and (4), the emotional distress sustained by Ram was so severe that no reasonable person could be expected to endure it. *Milam v. Bank of Cabot*, 937 S.W.2d 653, 658 (1997) (citations omitted). Arkansas courts take a narrow view of the tort of outrage. *Ross v. Patterson*, 817 S.W.2d 418, 420 (1991) (citations omitted). "[T]he tort of outrage is not easily established and requires clear-cut proof; merely describing the conduct as outrageous does not make it so." *Id.* The tort has been described as a "disfavored claim," *Sawada v. Walmart Stores, Inc.*, 473 S.W.3d 60, 69 (Ark. App. 2015), which is an "extremely narrow tort, rarely recognized in Arkansas caselaw," *McAdams v. Curnayn*, 239 S.W.3d 17 (Ark. App. 2006).

"Whether conduct is 'extreme and outrageous' is determined by looking at the conduct at issue; the period of time over which the conduct took place; the relationship between plaintiff and defendant; and defendant's knowledge that plaintiff is particularly susceptible to emotional distress by reason of some physical or mental peculiarity." *Jones v. Clinton*, 990 F. Supp. 657, 677 (E.D. Ark. 1998).

"Discomfort, upset, embarrassment, anxiety, loss of sleep, and depression do not meet the 'mental distress' element of the tort of outrage." *Duggar v. City of Springdale*, 599 S.W.3d 672, 682 (Ark. App. 2020). "The type of mental distress contemplated by this tort includes 'nervous

shock to emotional upset, and ... all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, anger, embarrassment, chagrin, disappointment, worry and nausea.'" *Mary C. Petty Family Trust v. Louton*, 591 S.W.3d 393, 396 (Ark. App. 2019) (quoting *Counce*, 596 S.W.2d at 687).

Taking Ram's allegations as true, the facts fall far short of the type of conduct that has been held by the Arkansas Courts to constitute extreme and outrageous, beyond all bounds of decency, by the Arkansas courts. *See e.g., Travelers Ins. Co. v. Smith*, 991 S.W.2d 591 (Ark. 1999) (burial delayed by insurance company's failure to have requested autopsy performed quickly resulting in the body not being embalmed and deteriorating to such an extent an open casket at the funeral was not possible. Family members suffered extreme emotional distress including anxiety and nightmares over lost chance to say farewell). Here, while Ram contends he suffered extreme emotional distress when Lay refused to give him his documents back, Ram was imprisoned at the time and had just lost his habeas corpus case and had no other available means to appeal his conviction. Ram testified he realized that he was going to have to serve his sentence of imprisonment despite his protests of innocence.

Here, until 2018, Ram had made no demand for return of his documents. Assuming Lay had notice of Ram's demand, Lay merely failed to act on that notice. As the Arkansas courts have repeatedly said, only the most egregious conduct which goes beyond all bounds of decency is sufficient to constitute the tort of outrage. *Crockett v. Essex*, 19 S.W. 3d 585, 589 (Ark. 2000). Lay's conduct does not reach the level required to establish extreme and outrageous conduct which is beyond all bounds of decency. Lay should be granted summary judgment on this claim.

### C. Negligent Infliction of Emotional Distress

Ram maintains Arkansas recognizes a cause of action for the negligent infliction of emotional distress. He cites the case of *Dowty v. Riggs*, 385 S.W.3d 117 (2010). The facts of that case were as follows:

> The claims in this case arouse from an incident that occurred on October 29, 2004, at the home of Evelyn, who is Karen's mother. That day, Karen, Gene, and Riggs traveled to Evelyn's residence to help her with some yard work. When they arrived, Evelyn's adult son, Perry Riggs, approached the vehicle and displayed a .25-caliber pistol. When Gene got out of the vehicle, Perry shot him in the arm. Karen exited the vehicle, and Perry continued to fire the gun. Thereafter, Karen removed Riggs from the vehicle and left the scene. Neither Karen nor Riggs was physically injured. Perry was charged with one count of battery, one count of aggravated assault on a family or household member, one count of terroristic threatening, and one count of endangering the welfare of a minor, but he was acquitted because of mental disease or defect. *Id.* at 118.

The circuit court, following existing precedent, declined to recognize a cause of action for negligent infliction of emotional distress and granted Evelyn's motion for summary judgment. *Id.* A certificate was issued to permit an immediate appeal. *Id.* Karen and Riggs argued "the facts of their case demonstrate that [the Arkansas Supreme Court] should now recognize a cause of action [for negligent infliction of emotional distress]." *Id.* at 120.

The Court noted that it:

> had long held that there can be no recovery for fright or mental pain and anguish caused by negligence, where there is no physical injury. The reason that mental suffering unaccompanied by physical injury is not considered as an element of recoverable damages is that it is deemed to be too remote, uncertain, and difficult of ascertainment; and the reason that such suffering is allowed as an element of damages, when accompanied by physical injury is that the two are so intimately connected that both must be considered because of the difficulty of separating them. *Id.* at 121 (cleaned up).

The court noted that the majority of jurisdictions recognized the tort and remarked it may revisit the issue in the future. *Id.* at 122. It held, however, that "the facts in the present case do not warrant the creation of a new tort." *Id.* Arkansas courts have continued to follow existing

precedent that have not recognized this tort. *See e.g., Pennebaker v. Furry Feet Retreat, Inc.*, 620 S.W.3d 879, 880 (Ark. App. 2021). Arkansas has not recognized the tort of negligent infliction of emotional distress. The Court must follow existing Arkansas precedent. Therefore, Lay is entitled to summary judgment on this claim.

### D. Punitive Damages

"Punitive damages are a penalty for conduct that is malicious or done with deliberate intent to injure another. Malice does not necessarily mean hatred; it is rather an intent or disposition to do a wrongful act greatly injurious to another." *Brown*, 161 S.W.3d at 306.

In the context of conversion cases, the Arkansas courts have stated that "punitive damages are not recoverable simply because the defendant intentionally exercised control or dominion over plaintiff's property." *Barton AGCenter, Inc. v. Case*, 459 S.W.3d 307, 312 (Ark. App. 2015) (citing *City Nat'l Bank of Fort Smith v. Goodwin*, 783 S.W.2d 335 (1990)). "To prevail on a claim for punitive damages for conversion, the plaintiff must show that the defendant intentionally exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages." *DWB, LLC v. D&T Pure Trust*, 550 S.W.3d 420, 428 (Ark. App. 2018) (cleaned up). "Additionally, the proof must rise to the level of clear and convincing evidence. Clear and convincing evidence is proof that produces a firm conviction that the allegation is true." *Barton*, 459 S.W.3d at 321 (citing Arkansas Model Instruction Civ. 2218; *Carter v. Four Seasons Funding Corp.*, 97 S.W.3d 387, 395 (2003)).

Review of the summary judgment record leads to the conclusion that there is an insufficient factual basis that would allow a trier of fact to conclude Lay "intentionally exercised control or dominion over [Ram's] property for the purpose of violating his right to property or for the purpose

15

of causing damages." *DWB*, 550 S.W.3d at 428. Lay is entitled to summary judgment on this issue.

## IV.   CONCLUSION

For the reasons stated, the Court recommends that Defendant's Motion for Summary Judgment (ECF No. 72) be **GRANTED IN PART and DENIED IN PART.**

- Specifically, the Motion should be **GRANTED** with respect to: (1) all conversion claims **except** the claim related to Lay's possession of the suitcase containing, among other things, Ram's important documents; (2) the intentional infliction of emotional distress claim; (3) the negligent infliction of emotional distress claim; and (4), the punitive damages claim.

- the Motion should be **DENIED** with respect to the conversion claim based on Lay's post-2018 possession and retention of a suitcase containing Ram's important documents. This is the sole claim that remains for trial.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of November 2022.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE